## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

KRISTI L. COMPTON,           :
                       :
         Plaintiff    :    No. 3:15-CV-1248
                       :
       vs.           :    (Judge Nealon)
                       :
CAROLYN W. COLVIN, Acting   :
Commissioner of Social Security,  :
                       :
        Defendant   :

**FILED**
**SCRANTON**

OCT 3 1 2016

PER _____ DEPUTY CLERK

### MEMORANDUM

On June 25, 2015, Plaintiff, Kristi L. Compton, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI")[2] under Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461, et seq and U.S.C. § 1381 et seq, respectively. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB and SSI will be vacated.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] her applications for DIB and SSI on October 26, 2010, alleging disability beginning on November 12, 2010, due to a combination of "fibromyalgia, tennis elbow, bipolar, degenerative disc disease, arthritis, depression, osteoporosis, anxiety, panic attacks, vitamin d deficiency, and scoliosis." (Tr. 165, 259).[4] These claims were initially denied by the Bureau of Disability Determination ("BDD")[5] on January 7, 2011. (Tr. 120). On February 28, 2011, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 120). An initial oral hearing was held on December 20, 2011, before administrative law judge Michele Wolf, ("ALJ"), who issued an unfavorable decision. (Tr. 120). On February 24, 2012, Plaintiff filed a request for review with the Appeals Council. (Tr. 156). The Appeals Council remanded the case back to the ALJ. (Tr. 136). The remand hearing was conducted on

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on August 25, 2015. (Doc. 9).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

November 4, 2013, before the ALJ, and Plaintiff and impartial vocational expert, Patricia Chilleri, ("VE"), testified. (Tr. 61). The ALJ issued a second decision denying Plaintiff's DIB and SSI claims on November 15, 2013. On January 6, 2014, Plaintiff filed a second request for review with the Appeals Council. (Tr. 7-9). On April 24, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-6). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on June 25, 2015. (Doc. 1). On August 25, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 8 and 9). Plaintiff filed a brief in support of her complaint on October 8, 2015. (Doc. 11). Defendant filed a brief in opposition on November 10, 2015. (Doc. 16). Plaintiff did not file a reply brief.

Plaintiff was born in the United States on December 30, 1970, and at all times relevant to this matter was considered a "younger individual."[6] (Tr. 205). Plaintiff graduated from high school in 1988, and can communicate in English.

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

(Tr. 258, 260).  Her employment records indicate that she previously worked as a manager, receptionist, salesperson, secretary, and bank teller.  (Tr. 222).  The records of the SSA reveal that Plaintiff had earnings in the years 1985 through 1987, 1989 through 1994, and 1996 through 2008.  (Tr. 184).  Her annual earnings range from a low of fifty-one dollars and eighty-two cents ($51.82) in 1986 to a high of thirty thousand two hundred eight dollars and sixty-seven cents ($30,208.67) in 2002.  (Tr. 184).  Her total earnings during these thirty-three (33) years were two hundred thirty-five thousand nine hundred forty-nine dollars and six cents ($235,949.06).  (Tr. 184).

In a document entitled "Function Report - Adult" filed with the SSA on November 25, 2011, Plaintiff indicated that she lived in a house with her family.  (Tr. 211).  From the time she woke up to the time she went to bed, Plaintiff would lie in bed waiting for her pain medication to work, would exercise upon getting out of bed as directed by her doctor, watched television, ate dinner with her family, and then went to bed.  (Tr. 211).  She took care of her son by getting him up for school and helping him with homework.  (Tr. 211).  She had problems with personal care tasks such as dressing and bathing, was able to prepare only simple meals that did not involve pots or pans, and was unable to do yard or house work.  (Tr. 212, 214).  She was able to drive a car, but not unaccompanied due to the fear

4

of back and neck spasms and hand numbness. (Tr. 214). She was able to walk uphill for four (4) minutes and downhill for six (6) minutes, and needed to rest for five (5) minutes before resuming walking. (Tr. 216). When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check talking, hearing, or seeing. (Tr. 216).

Regarding concentration and memory, Plaintiff needed special reminders to take care of her personal needs, take her medicine, and attend her appointments. (Tr. 213, 215). She could pay bills, but did not handle a savings account, use a checkbook, or count change because her husband "[took] care of the money." (Tr. 214). She could pay attention for five (5) minutes, could not follow written instructions, could follow spoken instructions "if the person was in front" of her, was not able to finish what she started, and did not hand stress or changes in routine well. (Tr. 216-217).

Socially, Plaintiff went outside for doctor's appointments and to go to the store with her husband, but she did not go out alone for fear that her back would go into a spasm. (Tr. 214). She did not spend time with others, and did not go anywhere on a regular basis. (Tr. 215). She had problems getting along with family, friends, neighbors, or others because her "bipolar ma[de] it hard to do anything or talk to people [and] depression [was] also a factor . . . can't be around

anyone but household family." (Tr. 216). With regards to authority figures, she would become very mad when told what to do, and reported that she had been fired from a job due to problems getting along with others as a result of her Bipolar Disorder. (Tr. 217).

## MEDICAL RECORDS

### A.    Physical Impairments

#### 1.    Dr. Ramos

Beginning in January 2009, Plaintiff saw Julio A. Ramos, M.D., for degenerative joint disease of the cervical spine, thoracolumbar scoliosis, and low back pain. (Tr. 784, 791).

On October 10, 2010, Plaintiff had a follow-up appointment with Dr. Ramos. (Tr. 908). Plaintiff's exam revealed spasms and tenderness. (Tr. 910). Plaintiff was assessed as having thoracic Degenerative Joint Disease ("DJD") with scoliosis and lumbar DJD with right sciatica. (Tr. 910). She was instructed to continue home exercise and to use a TENS unit. (Tr. 911).

On November 18, 2010, Plaintiff had an appointment with Dr. Ramos. (Tr. 912). It was stated that Plaintiff was suffering from back pain in the cervical and thoracic region, and that she could not "take [the] pain." (Tr. 912).

On February 24, 2011, Plaintiff had an appointment with Dr. Ramos for

further evaluation of osteoarthritis of the cervical and thoracic spine with thoracolumar scoliosis. (Tr. 988). Plaintiff's examination revealed musculoskeletal tenderness of the thoracic and cervical spine with mild extension, a limited range of motion, trapezius spasm, thoracic spine kyphosis, minimal thoracolumbar scoliosis and tenderness of the thoracic spine, intact joints, and a nonfocal neurological examination. (Tr. 988). Plaintiff's "Problem List" included axial osteoarthritis, cervical radiculopathy, and thoracic spine DJD. (Tr. 988). Plaintiff was prescribed OxyContin, Soma, and Vidodin, and was instructed to resume exercise. (Tr. 988).

On April 25, 2011, Plaintiff had a follow-up appointment with Dr. Ramos. (Tr. 989). Her physical examination revealed musculoskeletal kyphosis of the thoracic spine with paraspinus spasms of the thoracolumbar spine. (Tr. 989). Dr. Ramos gave Plaintiff an injection into the left medial epicondylar area, and she was instructed to consider water therapy. (Tr. 989).

On May 17, 2011, Plaintiff had an appointment with Dr. Ramos. (Tr. 990). It was noted that although Plaintiff had been doing relatively well, she had been having episodes during which her neck and back would "get[] stuck." (Tr. 990). Her physical examination revealed kyphosis with an exaggerated lordosis of the lumbar spine and exquisite paraspinal spasms. (Tr. 990). Dr. Ramos prescribed

7

Desipramine, and Plaintiff was scheduled for a follow-up. (Tr. 990).

On June 13, 2011, Plaintiff had a follow-up appointment with Dr. Ramos. (Tr. 990). It was noted that overall she was doing much better, and her physical examination remained unchanged. (Tr. 990). Dr. Ramos referred Plaintiff to physical therapy, and her medications were refilled. (Tr. 990).

On August 15, 2011, Plaintiff had an appointment with Dr. Ramos. (Tr. 993-995). The history of her illness noted that Plaintiff's pain was located at the back of her neck, her lower, mid, and upper back, and her right elbow, which had been present for an extended period of time and had worsened since its onset. (Tr. 993). Her pain radiated from her neck to her shoulders and arms, was aggravated by activity, kneeling, lifting, prolonged sitting, and stress, and was alleviated minimally by pain medication and rest. (Tr. 993). Her physical examination revealed tenderness of the parascapular and trapezius regions with mild spasms of the paravertebral muscles bilaterally; thoracic kyphosis and thoracolumbar scoliosis with moderate tenderness of the paraspinal area bilaterally; and tenderness of the right elbow. (Tr. 994). Plaintiff had full range of motion in her neck, spine, and upper and lower extremities. (Tr. 994). Plaintiff underwent an injection into the medial epicondyle in the region of maximal tenderness, and her prescriptions were refilled. (Tr. 994-995).

8

On November 29, 2011, Plaintiff had an appointment with Dr. Ramos. (Tr. 1978). She reported feeling "about the same compared" to her last visit and her physical examination remained unchanged. (Tr. 1078-1079). The Assessment noted that Plaintiff had scoliosis and kyphoscoliosis; thoracic intervertebral disc degeneration; lumbar and cervical spondylosis with myelopathy; and osteoporosis. (Tr. 1079). Plaintiff was instructed to increase her Desipramine dose. (Tr. 1079).

On January 30, 2012, Plaintiff had an appointment with Dr. Ramos for axial osteoarthritis. (Tr. 1081). It was noted that she felt the same as her prior appointment, and her physical examination remained unchanged. (Tr. 1081-1082). Dr. Ramos discontinued the Desipramine and prescribed Topamax. (Tr. 1082).

On April 30, 2012, Plaintiff had a follow-up appointment with Dr. Ramos for axial osteoarthritis. (Tr. 1084). It was noted that she had persistent thoracic pain with no relief from injections, bilateral elbow pain, spasms in her neck and back, feelings of "loss of body control," and other symptoms that had remained unchanged from her prior visit. (Tr. 1084). Plaintiff's physical examination was the same as the one from her prior visit. (Tr. 1085). She was given a medial epicondylar injection. (Tr. 1085). Her Topamax dosage was increased. (Tr. 1086).

On July 30, 2012, Plaintiff had an appointment with Dr. Ramos. (Tr. 1087).

9

After an altercation with a woman who had entered her home, she reported that she had fractured her right elbow and described the pain as burning. (Tr. 1087). Her other symptoms and physical examination remained the same compared to her last visit. (Tr. 1087-1088). She was instructed to discontinue Soma, which was replaced with Robaxin, and her Topamax dose was titrated. (Tr. 1089).

On October 2, 2012, Plaintiff had an appointment with Dr. Ramos. (Tr. 1090). She reported that the pain, swelling, and redness in her hands were worsening, and that her back pain was worse when compared to the last visit. (Tr. 1090). Her examination remained unchanged aside from her hands appearing "puffy." (Tr. 1091). Plaintiff was instructed to proceed with a pain clinic evaluation. (Tr. 1091).

On December 2, 2012, Plaintiff had an appointment with Dr. Ramos. (Tr. 1093). She reported increasing pain in her lower back that radiated into her right thigh after falling down a flight of stairs. (Tr. 1093). She also continued to complain of pain, swelling, and redness in both hands. (Tr. 1093). Her examination remained unchanged from her prior appointment. (Tr. 1094). Dr. Ramos prescribed Prednisone, and scheduled Plaintiff for an MRI of her lumbar spine. (Tr. 1095).

Plaintiff had several additional appointments with Dr. Ramos from May 28,

2013 through September 26, 2013. (Tr. 1237-1245). She reported that she continued to experience low and mid back pain, neck discomfort, and headaches that she felt were worsening and lacking relief. (Tr. 1236-1245). Her physical examination remained unchanged from her prior visits. (Tr. 1236-1245). Dr. Ramos noted that Plaintiff seemed "to be developing an inflammatory polyarthritic disease process. The differential diagnoses would include an inflammatory spondylarthritis with sacroiliac trigger discomfort. [She has a] mildly positive Schober's test and large joint swelling [in her] left knee." (Tr. 1241). Plaintiff was prescribed Prednisone and received an injection into her right elbow. (Tr. 1236-1245). She was instructed to continue with her medications, and was scheduled for a follow-up appointment. (Tr. 1245).

### 2.  David Caucci, M.D.

A patient of David Caucci, M.D. since 2007, Plaintiff had an appointment with him on June 14, 2012, after she was "assaulted in her home" and injured her right elbow in an incident that occurred on June 5, 2012. (Tr. 1257). Imaging at that time had revealed a right medial epicondylar avulsion fracture. (Tr. 1257). Plaintiff was splinted at the emergency room the day of the incident, and Dr. Caucci formulated a plan for Plaintiff's splint to be used only intermittently for comfort and for Plaintiff to start physical therapy. (Tr. 1257).

11

On November 15, 2012, Plaintiff had a follow-up with Dr. Caucci due to complaints of burning pain at the right medial elbow and burning pain in her palm across all of her fingers. (Tr. 1259). Her physical examination revealed that she was tender over the medial epicondyle of the right elbow, could fully extend the right elbow, had full supination and pronation, had ligaments stable to varus and valgus stress, had intact sensation, and had 4/5 muscle strength in her abductor digiti quinti and flexor digitorum profundus to the ring and little fingers. (Tr. 1259). Newer imaging revealed that the prior avulsion fragments on her right elbow were no longer present. (Tr. 1259). Dr. Caucci ordered an MRI of her right elbow. (Tr. 1259).

On January 3, 2013, Plaintiff had an appointment with Dr. Caucci due to continuing complaints of right elbow pain and paresthesias in the right upper extremity. (Tr. 1260). Her physical examination revealed mild thenar eminence wasting, tenderness over the carpal canal, a positive Tinel's sign, a positive Phalen's test, and an exquisitely tender medial epicondyle. (Tr. 1260). Plaintiff received an injection into her right elbow. (Tr. 1260).

On January 29, 2013, Plaintiff underwent surgery performed by Dr. Caucci to release the carpal tunnel syndrome on her right wrist. (Tr. 1262).

On February 14, 2013, Plaintiff had a post-surgical visit, and reported that

her numbness, tingling, and pain all seemed to be better. (Tr. 1264). She was instructed to start moving and using her hand, and to follow-up again in four (4) weeks. (Tr. 1264).

### 3.   Imaging

On August 10, 2011, Plaintiff underwent MRIs of the cervical and thoracic spine. (Tr. 984, 986). The conclusion of the thoracic MRI was that Plaintiff had multi-level mild chronic anterior wedge compression deformities of mid-lower thoracic vertebral bodies with accentuated kyphosis; spondylosis and shallow bulging at these levels with flattening of the thecal sac; suspected minimal thoracic syrinx; and indeterminate T8-T9 intramedullary T2 hyperintensity. (Tr. 984). The conclusion of the cervical MRI was that Plaintiff had cervical straightening and small disc protrusions from C3-C4 through C5-C6.

On June 5, 2012, Plaintiff underwent an MRI of her right elbow. (Tr. 1333). The impression was that he had multiple tiny avulsion fractures at the medial humeral epicondyle where the conjoined flexor tendon inserts. (Tr. 1333). Plaintiff also underwent an MRI of her cervical spine, which showed minimal spondylotic changes, and an MRI of his thoracic spine, which showed mild spondylotic changes and thoracic kyphosis. (Tr. 1337).

On December 11, 2012, Plaintiff underwent an MRI of her lumbar spine.

13

(Tr. 1203).  The conclusion was that Plaintiff had mild disc bulging at the L4-L5 level with associated borderline central spinal stenosis.  (Tr. 1203).

On December 18, 2012, Plaintiff underwent a nerve conduction test that suggested moderate to severe carpal tunnel syndrome and  mild right cubital tunnel syndrome.  (Tr. 1260).

On December 20, 2012, Plaintiff underwent an MRI of her right elbow.  (Tr. 1201).  The impression was that Plaintiff had mild lateral epicondylitis.  (Tr. 1201).   She underwent a CT of the cervical spine and her back, as well as an x-ray of her elbow.  (Tr. 1257, 1337-38).  The CT of the cervical spine showed minimal spondylotic changes and no significant facet arthrosis or acute cervical process. (Tr. 1337).  The CT of the thoracic spine revealed mild spondylotic changes and thoracic kyphosis with no findings of acute trauma.  (Tr. 1338).

### 4.   Physical Therapy

From June 27, 2011 through September 7, 2011, Plaintiff attended physical therapy appointments at Comprehensive Physical Therapy, Inc.  (Tr. 997).  At her August 8, 2011 appointment, Plaintiff noted that her continued back pain ranged from a seven (7) out of ten (10) to a ten (10) out of ten (10).  (Tr. 998).  Her pain also intermittently radiated into her anterior thighs, but did not go past her knees. (Tr. 998).  Her physical examination revealed moderate tenderness with palpation

14

of the bilateral lower lumbar paraspinals at the L3-S1 levels. (Tr. 999). Her

assessment stated that she had poor posture, decreased bilateral lower extremity

and abdominal strength, decreased flexibility, and pain limiting function. (Tr.

999). The plan was for Plaintiff to continue with physical therapy twice a week

for four (4) weeks. (Tr. 1000).

## B.   **Mental Health Impairments**

### 1.   **Dr. DeSoto**

During the relevant time period, Plaintiff had appointments with

Danilo DeSoto, M.D. from November 19, 2010 through March 2013. (Tr. 921-

926, 1020-1062, 1096-1146). Plaintiff reported that she was experiencing:

anhedonia; decreased anxiety; depression; feelings of hopelessness and

helplessness; irritability; racing thoughts; ruminations; sadness; overtalkativeness;

impulsiveness; mood lability; a decreased need for sleep; a good appetite; poor

concentration; no crying episodes; a fair energy and interest level; moderate

isolative behavior; ongoing pain; and difficulty staying asleep. (Tr. 921-

926,1020-1062, 1096-1146). Her mental status examination revealed: a

cooperative attitude; depression; an appropriate affect; clear, fluent, and

spontaneous speech; no speech aphasia or agnosia; intact language processing;

coherent and logic thought processes; intact associative thinking; a lack of

delusions and hallucinations; a lack of suicidal and homicidal ideations; an intact recent and remote memory; normal attention span and concentration; realistic and intact judgment; appropriate and intact insight; and knowledge and vocabulary consistent with education. (Tr. 922-926, 1020-1062). Plaintiff had an Axis I Diagnosis of Bipolar I Disorder that was moderate. (Tr. 922-926, 1005, 1020-1062, 1096-1146). At some visits, it was reported that, at times, she was "doing better," and at other times, she "could be better." (Tr. 921, 924, 1020-1062, 1096-1146). On several visits, Dr. DeSoto noted her anxiety and depression were improving. (Tr. 1121, 1125, 1127, 1133, 1139). She took several mental health prescription medications, including Geodon, Lithium, Klonopin, Zoloft. (Tr. 922-926, 1005, 1020-1062, 1098). Her Global Assessment of Function ("GAF") score ranged from a twenty-five (25) to a seventy (70). (Tr. 922-926, 1020-1062,1096-1146).

### 2.    <u>Matthew Berger, M.D.</u>

From March 13, 2013 through October 10, 2013, Plaintiff attended appointments with Matthew Berger, M.D., Dr. DeSoto's partner. (Tr. 1269-1301). She reported at these visits that she was not doing well, conveyed suicidal thoughts, noted that she was angry and irritable, had poor concentration and energy levels, experienced hallucinations, had decreased feelings of helplessness

16

and hopelessness, experienced ongoing isolative behavior, had ongoing ruminations, and had decreased mood lability and poor motivation. (Tr. 1269-1301).  Her mental status examination revealed that she had an appropriate affect, intact language processing, clear and fluent speech, intact associative thinking, no delusions, intact recent and remote memory, normal attention span and concentration, appropriate and intact insight, realistic and intact judgment, and knowledge and vocabulary consistent with education. (Tr. 1270-1301).  Plaintiff's medications included Abilify, Klonopin, Zoloft, and Lithium, and she was instructed to continue taking them. (Tr. 1271-1301).

### 3.    Hospitalizations

On July 11, 2011, Plaintiff was admitted to Community Medical Center after an appointment on this same day with Dr. DeSoto, during which she expressed having suicidal ideations, experiencing an increase in feelings of helplessness, hopelessness, anhedonia, and depression, and experiencing an increase in her inability to sleep. (Tr. 1070).  She had a GAF of forty (40) and agreed to hospitalization. (Tr. 1070-1071).   Upon admittance, Plaintiff's exam revealed she had a depressed mood, coherent speech, relevant thought processes, no overt delusions or hallucinations, and intact judgment, insight, reality content, and memory. (Tr. 1071).  Her Axis I diagnosis was Bipolar Disorder, depressed

17

phase. (Tr. 1071). Upon discharge on July 16, 2011, it was noted that Plaintiff's mood had improved, her affect was appropriate to her mood, and her GAF improved to a sixty (60). (Tr. 1073).

On March 16, 2012, Plaintiff was admitted to Community Medical Center after reporting to Dr. DeSoto that she had suicidal ideations. (Tr. 1175-1176). At the time of admission, she was experiencing increased depression, mood swings, irritability, command hallucinations, and poor frustration tolerance. (Tr. 1176). During her hospitalization, Plaintiff received therapy and medication, and "showed significant improvement in her overall mood and thoughts." (Tr. 1176). Plaintiff was discharged seven (7) days later on March 23, 2012, and her mental status examination at that time noted: a subdued mood; an appropriate affect; coherent speech; relevant thought processes with no overt delusions or hallucinations; no suicidal or homicidal ideations; and intact memory, judgment, insight, and reality. (Tr. 1175). Her discharge medications included Zoloft, Seroquel, Klonopin, Lithium, Oxycodone, and Vitamin D. (Tr. 1175).

On January 9, 2013, after a reported increase in anxiety, depression, and suicidal thoughts at an appointment with Dr. DeSoto, Plaintiff was admitted to Community Medical Center. (Tr. 1205-1209). Upon admission, it was noted that Plaintiff planned suicide by overdose and that she was experiencing some mild

command hallucinations, increased depression, irritability, agitation, and increased anxiety. (Tr. 1206-1207). The notes from this hospitalization stated, "She noted several stressors, including chronic pain which she feels have been poorly controlled." (Tr. 1207). Her GAF on admission was twenty-five (25) and her diagnosis continued to be Bipolar Disorder, mixed phase. (Tr. 1206). With inpatient treatment, it was noted that Plaintiff had an overall improvement in mood and function. (Tr. 1206). Plaintiff was discharged on January 14, 2013, with a GAF of fifty-five (55) and with coherent speech, relevant thought processes, an improved mood, an appropriate affect, no delusions or hallucinations, no suicidal or homicidal ideations or intent, and intact memory, judgment, insight, and reality. (Tr. 1205). Her discharge medications included Abilify, Klonopin, Lithium, Oxycodone, Zoloft, and Vitamin D. (Tr. 1205).

C.   **Medical Opinions**

1.   **Julio A. Ramos, M.D.**

On November 18, 2010, Dr. Ramos submitted a note stating that "Ms. Compton is unable to work [secondary] to debilitating osteoarthritic condition of her neck and thoracic spine. She will be unable to work for the foreseeable future." (Tr. 980).

2.   **Danilo A. DeSoto, M.D.**

On December 14, 2010, Dr. DeSoto completed a "Medical Source Statement of Ability to Do Work Related Activities (Mental)."  (Tr. 919).  Dr. DeSoto opined that Plaintiff had moderate limitations: in understanding, remembering, and carrying out short simple instructions; in responding appropriately to work pressures in a usual work setting; and in responding appropriately to changes in a routine work setting.  (Tr. 919).  He further opined that Plaintiff had marked limitations: in understanding, remembering, and carrying out detailed instructions; making judgments on simple work related decisions; and interacting appropriately with the public, supervisors, and co-workers (Tr. 919).  He indicated that the medical findings that supported his assessment were Plaintiff's poor concentration, increased anxiety, and mood swings.  (Tr. 919).

On July 29, 2011, Dr. DeSoto submitted an Affective Disorder Questionnaire.  (Tr. 982).  The questionnaire noted Plaintiff had anhedonia, appetite disturbance, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, past thoughts of suicide (which resulted in two (2) hospitalizations), marked restrictions of daily living, social functioning, and maintaining concentration or pace, and repeated episodes of decompensation.  (Tr. 982).

### 3.    John Rohar, Ph.D.

On December 30, 2010, John Rohar, Ph.D., a state agency consultant, completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique after review of the record. (Tr. 954-970). Dr. Rohar opined that Plaintiff had marked limitations in the ability to understand, remember, and carry out detailed instructions and moderate limitations in the ability to understand, remember, and carry out very short and simple instructions, to maintain attention and concentration for extended periods of time, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in the work setting. (Tr. 954-955). Dr. Rohar opined that Plaintiff had no restrictions in the remaining categories. (Tr. 954-955). Dr. Rohar reviewed Dr. DeSoto's opinion, and noted that he "relied heavily on the subjective report of symptoms and limitations provided by [Plaintiff]." (Tr. 956). In a Psychiatric Review Technique performed on the same day, Dr. Rohar opined that

Plaintiff had mild restrictions of activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence, or pace, and no repeated episodes of decompensation each of extended duration.  (Tr. 968).

### 4.    Feroz Sheikh, M.D.

On January 7, 2011, Feroz Sheikh, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment based on Plaintiff's medical record.  (Tr. 972-977).  Dr. Sheikh opined that Plaintiff could: occasionally lift and/ or carry twenty (20) pounds; frequently lift and/ or carry ten (10) pounds; and stand and/ or walk for six (6) hours in an eight (8) hour workday. (Tr. 972-974).  Plaintiff had no postural, communicative, or environmental limitations.  (Tr. 974-975).  Dr. Sheikh based his opinion on the medical records that noted that Plaintiff had essentially unremarkable neurological and motor examinations, despite muscle spasms and tenderness.  (Tr. 977).

### 5.    Matthew Berger, M.D.

On October 30, 2013, Dr. Berger completed an Affective Disorder Questionnaire.  (Tr. 1307).  Dr. Berger noted that Plaintiff had anhedonia, appetite and sleep disturbances, decreased energy, feelings of guilt or worthlessness, difficulty concentrating, and marked restrictions of daily activities, social functioning, and concentration, persistence or pace.  (Tr. 1307).  He opined that

"P[atien]t [is] unable to work at this time. " (Tr. 1308).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must

24

indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the Commissioner must determine the claimant's residual functional capacity.  Id.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one through four."  Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945;

26

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of September 30, 2013. (Tr. 24). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of September 23, 2010. (Tr. 24).

At step two, the ALJ determined that Plaintiff suffered from the severe[7]

---

7. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other

27

combination of impairments of the following: "degenerative disc disease/ spondylosis of the lumbar spine, kyphosis, kyphoscoliosis, degenerative joint disease of the thoracic spine, degenerative joint disease of the cervical spine, bipolar disorder, depressive disorder, carpal tunnel syndrome status post release on right, and medial epicondylitis with status post right medial epicondylar debridement and repair (20 C.F.R. 404.1520(c))." (Tr. 24).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (Tr. 25-27).

At step four, the ALJ determined that Plaintiff had the RFC to perform light work with limitations. (Tr. 27-34). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, [Plaintiff] had the [RFC] to perform a range of light work as defined in 20 CFR 404.1567(b). She could occasionally push and pull with the upper extremities, but no overhead reaching with the upper extremities. She could occasionally balance, bend, stoop, crouch, crawl, kneel, and climb, but no climbing on ladders, ropes, or scaffolds. She should avoid concentrated exposure to

---

evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

temperature extremes of hot/ cold, wetness, humidity, vibrations, and hazards, such as unprotected heights and moving machinery.  She could frequently grasp/ handle with the right dominant hand, and perform frequent fine manipulation with the right dominant hand.  She could do simple, routine tasks, but not complex tasks, and such tasks should be in a low stress work environment, defined as only occasional changes in the work setting and occasional decision making.  She could also have only occasional interaction with the public, co-workers, and supervisors.

(Tr. 27).

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the her age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569 and 404.1569(a))."  (Tr. 34-35).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between November 12, 2010, the alleged onset date, and the date last insured, September 30, 2013.  (Tr. 35).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) substantial evidence does not support the ALJ's rejection of the opinions of Plaintiff's treating physicians; and (2) the ALJ erred in failing to find that Plaintiff's

diagnosis of fibromyalgia was a severe impairment. (Doc. 11, pp. 12-17) .

Defendant disputes these contentions. (Doc. 16, pp. 21-34).

### 1.   <u>Opinion Evidence</u>

Plaintiff argues that substantial evidence does not support the ALJ's RFC

determination because improper weight was afforded to the opinions of the

treating physicians. (Doc. 11, pp. 12-16). Regarding the mental health

impairment opinions, Plaintiff asserts that the ALJ erred in giving no weight to the

opinions of Plaintiff's treating psychiatrists, Dr. DeSoto and Dr. Berger, and in

giving great weight to the opinion of Dr. Rohar, the non-treating, non-examining

state agency physician who rendered an opinion before Plaintiff's three (3)

psychiatric hospitalizations and a substantial quantity of psychiatric appointments

occurred and before Dr. Berger rendered his opinion. (Id. at 14-15).   Defendant

argues that the ALJ properly rejected the opinions of Dr. DeSoto and Dr. Berger

because they were unsupported by the mental status examinations, relied heavily

on Plaintiff's subjective complaints, and did not take into account Plaintiff's

improvement with treatment. (Doc. 16, pp. 26-29).   Defendant also asserts that,

consistent with Third Circuit precedent, the ALJ was permitted to rely on Dr.

Rohar's opinion even though it was rendered before Plaintiff's numerous

psychiatric hospitalizations and appointments occurred and before Dr. Berger

rendered his opinion. (Id.).

The responsibility for deciding a claimant's RFC rests with the administrative law judge.  See 20 C.F.R. § 404.1546.  In arriving at the RFC, an administrative law judge should be mindful that the preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits.  See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18.  It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion. 20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical

evidence of record.

Pursuant to Social Security Regulation 96-6p, an administrative law judge may only assign less weight to a treating source opinion based on a non-treating, non-examining medical opinion in "appropriate circumstances." SSR 96-6p, 1996 SSR LEXIS 3. This regulation does not define "appropriate circumstances," but gives an example that "appropriate circumstances" exist when a non-treating, non-examining source had a chance to review "a complete case record . . . which provides more detailed and comprehensive information than what was available to the individual's treating source." Id. (emphasis added).

Additionally, in choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject the treating physician's opinions outright only on the basis of contradictory medical evidence. Morales, 225 F.3d at 316-18. An ALJ may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id. An ALJ may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation

to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

Regardless of what the weight an administrative law judge affords to medical opinions, the administrative law judge has the duty to adequately explain the evidence that he or she rejects or affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000).

Defendant asserts that the holding from United States Court of Appeals for the Third Circuit in Chandler v. Commissioner of Social Security, 667 F.3d 356, 361 (3d Cir. 2011), prevents Plaintiff from prevailing on the argument that the ALJ in this case erred in relying on Dr. Rohar's opinion because Dr. Rohar rendered his opinion in the absence of a complete medical record. (Doc. 16, pp. 26-29). In Chandler, the Third Circuit held that a time lapse from the date a non-treating, non-examining physician rendered an opinion to the date the administrative law judge issued an opinion, in the absence of an opinion from a treating physician, was not a basis for remand. Id. The remainder of the opinion rendered in Chandler, and to which Defendant refers, is dicta, and will be treated as such by this Court. See Leach v. Colvin, 2016 U.S. Dist. LEXIS 96718, at *25

(M.D. Pa. June 20. 2016) (Cohn, J.), report and recommendation adopted, 2016 U.S. Dist. LEXIS 96407 (M.D. Pa., July 25, 2016 (Kane, J.) (holding that statements in Chandler are dicta as applied to cases where the ALJ relies on a state agency opinion to assign less than controlling weight to a treating source medical opinion.).  The District Court cannot deviate from binding precedent in Brown, Morales, Brownawell, Diaz, or SSR 96-6p, 1996 SSR LEXIS 3 based on dicta in Chandler.  See Burns v. Colvin, No. 1:14-cv-1925, 2016 U.S. Dist. LEXIS 4079, 2016 WL 147269, at *1 (M.D. Pa. Jan. 13, 2016) (citing Kool, Mann Coffee & Co. v. Coffey, 300 F.3d 340, 355, 44 V.I. 419 (3d Cir. 2002) (statements that are "not necessary to the actual holding of the case" are "dicta" and "not binding"); Calhoun v. Yamaha Motor Corp., 216 F.3d 338, 344 n. 9 (3d Cir. 2000) ("Insofar as this determination was not necessary to either court's ultimate holding, however, it is properly classified as dictum.  It therefore does not possess a binding effect on use pursuant to the 'law of the case' doctrine.")))).

The Third Circuit has not upheld any instance, in any precedential opinion, in which an administrative law judge has assigned less than controlling weight to an opinion rendered by a treating physician based solely on one (1) opinion from a non-treating, non-examining examiner who did not review a complete case record. See Brown v. Astrue, 649 F.3d 193 (3d Cir. 2011) (holding that the administrative

law judge did not err in affording more weight to a medical opinion rendered by a non-examining physician because the physician testified at the oral hearing and had a chance to review the entire case record); <u>Brownawell v. Commissioner of Social Security</u>, 554 F.3d 352 (3d Cir. 2008) (holding that three (3) non-treating opinions were not sufficient to reject a treating source medical opinion because they were "perfunctory' and omitted significant objective findings promulgated after the non-treating opinions were issued); <u>Morales</u>, 225 F.3d at 314 (holding that remand was proper because the claimant's residual functional capacity was based on an opinion rendered by a non-treating, non-examining physician who "review[ed] [claimant's] medical record which . . . did not include [two physicians'] reports" and was thus based on an incomplete medical record).

In the case at hand, regarding the medical opinion evidence involving Plaintiff's mental health impairments, the ALJ gave no weight to the aforementioned opinions of Plaintiff's long-standing treating psychiatrists, Dr. DeSoto and Dr. Berger. (Tr. 32-33). The ALJ explained that no weight whatsoever should be given to these opinions because they were not supported by the record as a whole, because Plaintiff's condition improved with treatment, and because mental status examinations were "essentially within normal limits, except for the March 16, 2012 examination." (Tr. 32-33). Instead, the ALJ gave great

35

weight to the opinion of Dr. Rohar, a non-examining, consultative examiner, because the ALJ found this opinion to be supported by the evidence of record. (Tr. 32).

In accordance with this aforementioned binding Third Circuit precedent that has been reiterated in a significant amount of cases, this Court finds issue with the ALJ's reliance on Dr. Rohar's opinion that was rendered in December 2010, before three (3) week-long psychiatric hospitalizations and a substantial quantity of psychiatric appointments occurred and before treating psychiatrist Dr. Berger issued a more restrictive opinion. (Tr. 921-926, 1020-1062, 1070-1073, 1096-1146, 1175-1176, 1269-1301). While Defendant cites to Chandler as precedent in support of the ALJ's reliance on Dr. Rohar's opinion, as discussed, the part of the opinion to which Defendant cites is dicta, and thus not binding on this Court. Moreover, the Third Circuit and subsequent cases from the Middle District of Pennsylvania have repeatedly held that, especially in an instance in which a condition worsens, an administrative law judge errs in relying soley on an opinion issued by a non-treating, non-examining physician who has not reviewed a complete case record.

As such, upon review of the entire record and the ALJ's RFC determination, it is determined that the ALJ improperly afforded significant weight to the opinion

of the non-treating, non-examining physician, Dr. Rohar, in determining Plaintiff's

mental health RFC because Dr. Rohar issued his opinion before substantial

evidence of record occurred that showed a worsening of Plaintiff's mental health

impairment.  Surely, three (3) psychiatric hospitalizations, each averaging to be a

week long, does not show that Plaintiff's condition was improving.  Regardless, an

administrative law judge's RFC determination is not supported by substantial

evidence when significant medical findings and events occur after the rendering of

an opinion that was soley relied on by the ALJ in determining Plaintiff's mental

RFC.  Therefore,  remand on this basis is necessary, and this Court declines to

address Plaintiff's remaining assertions.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined

that the Commissioner's decision is not supported by substantial evidence.

Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision

of the Commissioner will be vacated, and the matter will be remanded to the

Commissioner of the Social Security Administration.

A separate Order will be issued.

**Date**: October 31, 2016

                                /s/ **William J. Nealon**
                                **United States District Judge**

37